# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION
### Case No.: 03-21063-CIV-Altonaga/Bandstra

FILED by _____ D.C.
INTAKE

MAR 1 1 2005

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. MIAMI

DAVID ALLEN,

                Plaintiff

vs.

CITY OF MIAMI, a Municipal corporation
in Miami-Dade County, State of Florida, et. al

                Defendants.

_____/

## PLAINTIFF'S STATEMENT OF FACTS IN SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM OF LAW

       NOW COMES the Plaintiff, by and through his undersigned attorneys and hereby files a statement of facts in support of Plaintiff's Response to Defendants' Motion for Summary Judgment and Memorandum of Law, and in support thereof says as follows.

## LOCAL RULE 7.5 STATEMENT OF MATERIAL FACTS
### INTRODUCTION

       The Plaintiff will set forth facts concerning the subject incident, prior incidents of excessive force judicially determined to be unconstitutional, unconstitutional practices within the Miami police department as well as the career records of not only officers involved herein, but officers from the same crime unit that was involved in the David Allen shooting. The Court might inquire why facts about other shootings, career records of officers not involved in this case and certain other practices that have been happening in the City of Miami for the past 20 years are included. The answer is that the Plaintiff is under an obligation to present to this Court facts that the custom and practice of the Miami police department was to allow its officers to use excessive force despite actual and constructive knowledge of the abuses and allow the same to go on for many years. The facts that follow concern an incident that occurred on July 27, 2000. On that date, David Allen stopped his truck on Williams Avenue to urinate. Defendants Tapanes

and Camacho were working a drug sting operation and had arrestee Christopher Jones in the back seat. Tapanes and Camacho were traveling the opposite way on Williams Avenue when they noticed Allen standing in the opening of his truck door. Camacho backed his vehicle up and got next to the Plaintiff's truck. Tapanes jumped out of the unmarked car and for no apparent reason fired three rounds at Allen.

At that time, the homicide division was always assigned to investigate police officer involved shootings. A cover-up ensued that involved filing a false and misleading police report, planting a weapon in Allen's truck and suborning the perjury of witness Christopher Jones in exchange for his release on obstruction of justice charges.

1.     On July 27, 2000, Plaintiff, David Allen ("Allen" or "Plaintiff"), consumed a couple of beers and left for home at about 5:00 p.m. (Allen Deposition-civil case p. 55). On the way to his destination Mr. Allen had to urinate. Mr. Allen stopped his pick-up truck on Williams Avenue. Mr. Allen pulled his truck into a parking spot right next to the curb, got out of his truck and stood in the opening of his door to relieve himself. (Allen Dep. civil case p. 56).

2.     At or about that time City of Miami plainclothes police Officers Pablo Camacho and Lionel Tapanes while working a reverse sting drug operation were driving in an unmarked vehicle on Williams Avenue in the opposite direction to Allen and were also transporting arrestee Christopher Jones. (Tapanes Dep.-civil case, p. 32, ll. 2-15, p. 41, ll. 10-12, p. 42, ll. 7-11, p. 47, ll. 6-2).

3.     Witness Sharayne Milton gave a taped sworn statement to the Miami Police on July 27, 2000, a deposition in the criminal case, pertaining to Allen and a deposition in this case. After the incident she made a comment to officer Tapanes who said to another officer words to the effect of "damn I messed up." (Milton Dep. civil case p. 19, ll. 21-25, p. 20, ll. 1-11, and Dep. criminal case p. 42). In her sworn statement to the Miami Police, her deposition in the criminal case and her deposition in this case Ms. Milton testified that Allen's truck was not moving when Tapanes fired the first shot (Milton sworn statement p. 7, ll. 12-18, Dep. criminal case, p. 21, ll. 7-10, Dep. civil case, p. 13 ll. 1-10).

4.     In her criminal deposition Ms. Milton testified that she did not see any badges and only noted that Tapanes had on a t-shirt that had police printed on the back of the shirt. (Milton Dep. criminal case p. 17, ll. 6-19, Dep. civil case p. 10, ll. 5-23, p. 16, ll. 16-25, p. 17, ll. 1-18). Ms. Milton testified that other than hearing the word "[F]reeze" she heard nothing from the

police officers. (Milton Dep. criminal case, p. 18, ll. 1-7, Dep. civil case, p. 14, ll. 8-12). Ms. Milton testified in her depositions that she heard three shots fired. (Milton Dep. criminal case, p. 19, ll. 9-13, Dep. civil case, pp. 11-15). Ms. Milton with the use of a diagram testified that Tapanes got out of his car and shot over the hood of his car into Allen's truck when the truck was not moving. (Milton Dep. criminal case, p. 21, ll. 1-10, Dep. civil case, p. 12, ll. 1-25). (See attached diagram **Exhibits 1 and 2**.) At both depositions Ms. Milton testified that she also saw Allen put his hands up as to indicate he had no weapon. (Milton Dep. criminal case, p. 22, ll. 11-21, Dep. civil case, p. 19 ll. 3-5). Ms. Milton testified that Tapanes fired the third shot at the back of the truck. (Milton Dep. criminal case p. 34, ll. 1-25, p. 35, ll. 1-6, Dep. civil case p. 16, and p. 18, ll. 11-19). Ms. Milton testifies in her deposition that Tapanes fired the first shot from the passenger side of the car he was occupying crossing that car to the truck. (Milton Dep. criminal case p. 40, ll. 7-10).

5.     Witness Phyllis Taylor gave a sworn statement to Miami Police and a deposition in the criminal case. At her deposition Ms. Taylor confirmed that when Camacho backed up his vehicle towards Allen, Camacho had his gun drawn and hanging out of the car. (Taylor Dep. criminal case, pp. 16-17, ll. 20-25 and 1-22, respectively and sworn statement p. 5, ll. 3-23). Ms. Taylor testified that both officers were in plain clothes and in an unmarked car and at no time identified themselves as police officers. (Taylor Dep. criminal case, p. 23, ll. 5-19). Ms. Taylor testified that she heard three (3) shots fired. (Taylor Dep. criminal case, p. 29, ll. 1-8). Taylor testified that Tapanes was at the back bumper on the passenger side of his vehicle when he fired the first shot. (Taylor Dep., criminal case, p. 30, ll. 1-6). Ms. Taylor testified that when the first shot was fired Allen's truck was never close to hitting the passenger of the car, namely Tapanes. (Taylor Dep. criminal case, p. 30, l. 25, p. 31, ll. 1-3, p. 35, ll. 10-12, and sworn statement p. 11, ll. 18-20).

6.     Witness Ira Davis testified that there were three (3) shots fired, that the truck was not moving when the first shot was fired and that Tapanes was not in danger of being run over when the first shot was being fired. (Davis Dep. civil case, p. 7, ll. 1-25, p. 8, ll. 1-22). Davis testified that this is what she told the City of Miami when she was debriefed (Davis Dep. civil case, p. 12, ll. 15-23). Attached hereto and marked as **Exhibit 3**, copy of what the City of Miami wrote down concerning what Ira Davis saw. The City of Miami left out that the vehicle was not moving and that Officer Tapanes was not in any danger of being run over.

7.      Tapanes testified that his only basis to use deadly force was the imminent threat/fear of being run over by Allen. (Tapanes sworn statement p. 10, ll. 1-3, Tapanes Dep. civil case p. 76, ll. 21-25).

## DISPUTED MATERIAL FACTS AS TO COVER-UP

8.      Attached hereto and marked as **Exhibit 4** is a copy of a report prepared by Defendant Nelson Andreu.  That report concludes that Tapanes use of deadly force was justified as "all witnesses with slight variation" told the same story as Tapanes. (**Exhibit 4**, p. 8).

9.      At the time of the subject incident Defendants Camacho and Tapanes had arrestee Christopher Jones in the back seat of their vehicle.  Jones had been arrested for obstruction of justice and was being transported at the time of this incident. (Tapanes Dep., civil case, p. 37, ll. 2-25).  The Nelson Andreu report states that Christopher Jones supported Tapanes's theory that deadly force was justified because Tapanes was in danger of being run over. (**Exhibit 4**, p. 7).

10.     Now retired Miami police officer Jack Calvar initially interviewed Christopher Jones at the time of this incident.  Calvar testified that he learned at the scene that it was a police involved shooting with plainclothes officers in an unmarked car. (Calvar Dep., civil case, p. 11, ll. 4-14).  Calvar testified to taking the statement of Christopher Jones. (Calvar Dep., civil case, p. 21, ll. 11-15).  At his deposition in this case Defendant Calvar testified that Christopher Jones was "a very important witness in this case". (Calvar Dep., civil case, p. 21, ll. 16-25, p. 22, ll. 1-12).  Calvar went on to testify that after he took the statement of Christopher Jones and then Jones was taken to jail. (Calvar Dep., civil case, p. 29, l. 4-6).

11.     At his sworn statement in the criminal case Christopher Jones stated that Allen tried to run over Tapanes. (Jones sworn statement, p. 5, ll. 1-2).

12.     At his deposition Jones testified that he tried to explain to his interviewer, Jack Calvar, that Tapanes shot David Allen for no reason; however Jones was convinced not to give a statement to that effect in exchange for Jones's release on the obstruction of justice charge. (Jones Dep., civil case, p. 10, ll. 10-25, p. 11, ll. 1-25, p. 12, ll. 1-13).  Jones explained that as soon as he gave the untruthful testimony Jones was released and eventually nolle prossed for the obstruction of justice charge.  Attached hereto and marked as **Exhibit 5** is a copy of Jones's criminal record which confirms Jones's testimony that the obstruction of justice case was dropped.  Attached hereto marked **Exhibit 6** is a letter from the state attorney's office stating that

4

there is no file for Christopher Jones for July 27, 2000 for the obstruction charge. The City of Miami was asked to produce jail records documenting Jones's arrest, but did not do so because such records do not exist. (Jones Dep., civil case, p. 13, ll. 1-25, p. 14, ll. 1-25, p. 15, ll. 1-25, *see also*, Calvar Dep., civil case, p. 29, ll. 1-25, p. 30, ll. 1-8). See **Exhibit 7**, Affidavit of Curtis King, investigator.

13.     At his deposition Jones confirmed that Camacho had his gun pulled out immediately. (Jones Dep., civil case, p. 7, ll. 5-12). Jones testified that Allen appeared to leave because from Jones's it looked like a robbery. (Jones Dep., civil case, p. 8, ll. 1-6).

14.     Christopher Jones testified at his deposition in this case that Tapanes shot Allen for no reason and that Tapanes was not in any danger of being run over by Allen. (Christopher Dep., civil case, p. 8, ll. 1-21).

15.     Sharayne Milton testified at her deposition in this case that she saw Christopher Jones on the evening of July 27, 2000, and that Jones told her that the police told him [Jones] that they were going to let him go if he [Jones] said that David Allen tried to run over Tapanes. (Milton Dep., civil case, p. 23, ll. 19-25, p. 24, ll. 1-3).

16.     The City of Miami tried to intimidate witness Sharayne Milton and convince her not to testify that Allen was not trying to run over Tapanes. (Milton Dep., civil case, p. 24, ll. 15-25, p. 25, ll. 1-6). Ms. Milton testified that her interviewer kept turning off the tape recorder whenever she stated that Tapanes shot Allen for no reason or that three shots were fired. (Milton Dep., civil case, p. 25, ll. 22-25, p. 26, ll. 1-3).

17.     During Sharayne Milton's trial testimony in the criminal case she stated that she overheard Tapanes and another Miami police officer that she recognized from the scene as a Chinese man, discussing the case. Milton testified at her deposition that Tapanes asked the Chinese officer about bullets. Tapanes was reassured "not to worry about it". (Milton Dep., civil case, p. page 27, ll. 1-25, p. 28, ll. 1-19).

18.     That a third casing was found at the scene and analyzed, the report states that the casing cannot be eliminated as to one from Defendant Tapanes's gun. (See **Exhibit 8** Lab report).

19.     Based on the incident of July 27, 2000, David Allen was tried for assault with a deadly weapon a charge of which he was acquitted. (See **Exhibit 9**).

## DISPUTED MATERIAL FACTS REGARDING
## CITY OF MIAMI'S ATTEMPT TO PLANT A GUN IN THIS CASE

20.     Sometime after the incident, but before Mr. Allen was released, his pickup truck was photographed and evaluated by the City of Miami. Several days after the incident and after Mr. Allen's release from hospital, evidence technician Fabrice Nelson went to Mr. Allen's house. Nelson did not call in advance, but rather simply drove to Mr. Allen's house in his city vehicle, pulled up, looked around and allegedly retrieved a clip or magazine from Mr. Allen's truck. (Nelson Dep., civil case, p. 80, ll. 10-25, p. 81, ll. 1-13). Nelson testified that this magazine was retrieved from a plastic grill on Mr. Allen's truck (Nelson Dep., civil case, p. 82, ll. 1-8). Evidence technician Nelson did not fill out a report in connection to this occurrence nor did he report it to a supervisor. (Nelson Dep., civil case, p. 82, ll. 12-25, p. 83, ll. 1-5).

21.     Nelson testified that dowel trajectory analysis showed one bullet was fired at a right angle to the side window of Mr. Allen's truck and a second shot was fired from the rear of Allen's truck. See photograph **Exhibits 10, 11 & 12**). (Nelson Dep., civil case, p. 39, ll. 1-25, p. 40, ll. 1-25, and p. 41, ll. 1-21).


## DISPUTED MATERIAL FACTS AS TO THE CITY'S DELIBERATE INDIFFERENCE
## TO THE CONDUCT OF ITS OFFICERS

22.     Geoffrey Alphert, Ph.D, has worked for and testified as an expert for the City of Miami. He gave a deposition in a lawsuit know as *Alice Young personal representative of the Estate of Antonio Alexander Young v. City of Miami et al*, Case No. 99-2294-CIV-Martinez on January 10, 2003. In that deposition Geoffrey Alphert quoted from his book that the problems of the City of Miami began in the 1980s and continued into the 1990s. (Alphert Dep., p. 21, ll. 2-25, p. 22, ll. 1-25, p. 23, ll. 1-25, p. 24, ll. 1-6).

23.     The Grand Jury report that Doctor Alphert refers to is attached herein and marked as **Exhibit 13**. As can be noted officials from the City of Miami at the highest levels were told that as far back as the early 1980s, the City of Miami had a serious problem about police officer involved shootings. See Grand Jury Report page 1. The report goes on to state that if an Official violates the policy he must be reprimanded. (See Grand Jury report page Exhibit 13, p. 16).

6

24.     The Grand Jury report also determined that the City of Miami had:  "[P]laced entirely too much emphasis upon weapons and the use of force in police training and far too little emphasis on alternatives to the use of force." (Exhibit 13, page 4).

25.     In this case, the Firearms Advisory Board in February 2003 tried to reprimand Tapanes and advised termination but the recommendation was not followed. (**Exhibit 14**, see also Tapanes Dep., civil case, p. 21, ll. 5-24, p. 22, ll. 1-11).

26.     Attached are **Exhibits 15, 16 and 17**: an indictment and two (2), superseding indictments dated January 22, 2003 and February 18, 2004, respectively.  They charged eleven current and former City of Miami police officers with being part of a conspiracy to obstruct justice and obstruction of justice by planting guns and lying about their actions in four different officer involved shootings. (Exhibit 16).  The charges related to four (4) police officer involved shootings:

     a.     the November 7, 1995, fatal shooting of Antonio Young and Derrick Wiltshire after they jumped from the I-395  overpass above North Miami Avenue (Exhibit 16, p. 3-4);

     b.     the March 12th, 1996, fatal shooting of Richard Brown,  a 72 year old man, in his apartment at 1334 north west 7th Court (Exhibit 16, p. 4);

     c.     the April 13, 1996, shooting of Stephen Carter in the vicinity of 340 2nd N.W 43rd Street (Exhibit 16, page 5);

     d.     the June 26, 1997, the shooting and wounding of Daniel Hoban, a homeless man who was holding a walkman radio in coconut grove. (Exhibit 16, page 5).

27.     All of the officers involved in the above incidents had worked for the Miami police department's Street Narcotics Unit (SNU) or Crime Suppression Team.  Several of the officers had also been members of the SWAT team. (Exhibit 16, page 2).  As to the indictments a federal jury convicted the following Miami police officers and for which verdict forms are attached:

     a.     Israel Gonzalez

     b.     Arturo Beguiristain

     c.     Jose Quintero

     d.     Jorge Garcia

     e.     Jesus Aguero

        f.      Oscar Ronda

        g.      Jorge Castello

        h.      Jose Acuna

See **Exhibit 18 (a)-(h)**.

28.     Two retired police officers from the Miami police department, William Hames and John Mervolion had previously entered guilty pleas to conspiring with their fellow police officers to obstruct justice and testified at the trial. (**Exhibits 19 and 20**).

29.     Defendant Gonzalez, herein, took the Fifth Amendment at his deposition in this case on substantive issues. (Gonzalez Dep., civil case, p. 17, ll. 1-15). Gonzalez detailed his career with the Miami police department. (Gonzalez Dep., civil case, p. 5, ll., 18-25, p. 6, ll. 1-25, p. 7, ll. 1-2, p. 9, ll. 21-25, p. 10, ll. 1-9, p. 11, ll. 8-24, p. 13, ll. 13-25 and p. 14, ll. 1-7). Defendant Gonzalez took the Fifth Amendment on his job responsibilities while in the Street Narcotics Unit. (Gonzalez Dep. civil case, p. 10, ll. 1-25, and p. 11, lines 1-10).

30.     Gonzalez was Lieutenant and Commander of the Homicide Division of the Miami police department. That division was responsible for investigating police officer involved shootings. (Gonzalez Dep., civil case, p. page 18, ll. 1-2).

31.     Gonzalez testified that in his job as Executive Assistant to the Chief of Police, Gonzalez was a liaison to Federal and International authorities and also oversaw the disciplinary review board process. (Gonzalez Dep., civil case, p. 13, ll. 20-25 and p. 14, ll. 1-7). Gonzalez held this position before this case but after the I-395 shooting. Gonzalez did testify that there is only one person in the whole Miami Police Department who was in charge of the division that investigates police officer involved shootings. (Gonzalez Dep., civil case, p. 17, ll. 23-25, p. 18, ll. 1-2 and p. 19, ll. 2-4).

32.     It was learned that with regard to the David Allen shooting Defendant Gonzalez was the lieutenant in charge of the homicide unit that did actual investigation and that Gonzalez was in charge of all persons involved in the investigation. This responsibility included being the recipient of all information gathered at the scene and being made aware of all witness statements. (Christmas Dep., civil case, p. 23, ll. 15-25, pp. 24-26 and p. 27, ll. 1-11).

33.     In April 2004, Gonzalez was convicted of perjury, conspiracy to obstruct justice and obstruction of justice in connection with his role in the I-395 shooting. (Exhibit 16 and 18).

34.     Between 1984 and 2000 Defendant Gonzalez was the subject of thirty-eight Internal Affairs investigations.  (**Exhibit 21** and **21a**).  Between 1996 and 2002 Defendant Tapanes was the subject of twenty-nine Internal Affairs investigations.  (**Exhibit 22**). Defendant Camacho was the subject of five Internal Affairs investigations between 2000 and 2002. (**Exhibit 23**). Investigator Aliva was investigated nine times between 1984 and 2002.  (**Exhibit 24**).

35.     William Hames testified at the criminal trial referred to as *USA v. Acuna et al*, Case No. 01-208crGold, US District Court of Florida, Southern District (2003), on two occasions. The so-called "I-395 shooting case" involved gun planting and then a meeting thereafter that included Defendant Gonzalez, herein, where a conspiracy was hatched to cover-up the true facts. (Hames trial testimony, p. 23, January 28, 2003, vol. 13).  Hames testified that at no time did he see guns at the scene of I-395 shooting yet guns were found.  (Hames trial testimony, pages 24-29, January 28 2003 volume 13).  The whole business of gun planting had a long history and its own vernacular. (Hames trial testimony, pages 17-19, January 28, 2003, vol. 13).

36.     After the I-395 shooting officers Hames, Mervolion, Art Beguiristain, Jorge Garcia, Jesse Aguero and Defendant Gonzalez herein, went to the Bar-B-Q Restaurant to make up a story as to how the shooting victims had guns when in actuality they did not. (Hames trial testimony, p. 16, ll. 20-25, and p. 17, ll. 1-17, January 28, 2003, vol. 13).  Hames testified that Defendant Gonzalez on the night of the I-395 shooting was a SNU Supervisor.  (Hames trial testimony, p. 194, ll. 22-24).  Hames stated he was not worried about the other officers as they all adhered to 'a code of silence' (Hames trial testimony, direct examination of Hames, pp. 186-314, p. 243, ll. 17-25, p. 244, l. 1).

37.     Hames also testified to facts on how Miami police department officers came to know 'throw down'. (Hames trial testimony, pp. 86-93, February 26, 2003, vol. 29).  Hames spoke of an event at the police range where he was working at the time in 1997. Hames was asked by Jesse Aguero if he would take possession of a gun (model Astra) remove its finger prints and return it to Aguero himself but if Hames wasn't able to contact Aguero then he was to return the gun to Acuna who at that time was Aguero's supervisor/sergeant.  (Hames trial testimony, pp. 87-89, 90-93 and p. 154, ll. 4-17, February 26, 2003, vol. 29).

9

38.     Officer Burt Bell testified to an occasion where he was asked by Quintero if he could get hold of a 'sock' (a/k/a a throw down) as at that time Bell was working at the range. (*Acuna, supra*, Order, Gold, J. on Rule 801(D)(2)(e) Statements, p.6 and 85).

39.     John Mervolion also testified at *Acuna, supra*, trial. Mervolion saw no guns on the night of the I-395 shooting and that a meeting to conspire was held the next day. Defendant Gonzalez, herein, attended. (Mervolion trial testimony, pp. 60-62, pp. 67-69, February 19, 2003, vol. 25 and pp. 217, 256-262, February 18, 2003).  Mervolion specifically testified that Defendant Gonzalez was a supervisor and that he went along with the conspiracy[1] and confirms the I-395 conspiracy meeting (Mervolion trial testimony, p. 11, February 13, 2003).

40.     Mervolion testified that Gonzalez said at the Bar B-Q restaurant meeting after the I-395 shooting that the reason they were all there was to get on the same page. (Mervolion trial testimony, page 257 lines 2-7, February 13, 2003).

41.     Mervolion stated that Defendant Gonzalez, herein, was fully aware of a concern that someone at some point may wear a wire to uncover the conspiracy (Mervolion trial testimony, p. 277, February 13, 2003).

42.     Mervolion specifically referred to how it was an unwritten rule that all officers would "cover each others backs" (Mervolion trial testimony, pp. 275-276, February 13, 2003).

43.     Mervolion testified that approximately a week prior to the I-395 shooting, he and Miami police officer Beguiristain were in the process of trying to arrest a robbery suspect and that Beguiristain shot at the suspect. The suspect was caught and charged with armed robbery but the subject did not have a gun; however Mervolion testified that when he was asked if the subject had a gun, Mervolion lied and said 'yes'. (Mervolion trial testimony, p. 265, ll. 24-25, p. 266, ll. 1-25, p. 267, ll. 1-25, February 13, 2003, and pp.74-77, February 19, 2003, vol. 25). Mervolion testified to being asked if he had a "throw down" immediately after this incident by his partner Art Beguiristain. (Mervolion trial testimony, p. 268, ll. 2-15).  In his testimony he defines what is understood by a "throw down", he states, "a gun that we keep in our cars at times used to justify a shooting" (Mervolion trial testimony, p. 268, ll. 17-18, February 13, 2003). He further testified that Miami police officers kept guns in their cars at times, which were used to justify shootings. (Mervolion trial testimony, p. 265, ll. 19-25, p. 266-269, February 13, 2003).

---

[1] Defendant Gonzalez was head of the Homicide Unit of the Miami Police Department at the time of this incident).

44.     After the I-395 shooting Mervolion testified that he took possession of a gun under the premise to hold on to it in case it is needed. (Mervolion trial testimony, p. 285 ll. 10-25, p. 286, ll. 1-25 and p. 287, ll. 1-25, February 13, 2003.)

45.     Mervolion testified to another incident that involved a throw down gun which happened April 13th 1996. (The Steven Carter gun planting referred to in paragraph 24, number 3 above). A situation had occurred wherein Mervolion was advised that "Jesse needs that gun" referring to the gun given to him by Aguero previously. Eventually that gun was planted to justify an arrest. (Mervolion trial testimony, pages 291-302 and page 303 lines 1-10. February 13th 2003).

46.     Mervolion testified about the gun planting at the Coconut Grove shooting (Mervolion trial testimony, pp. 186 -188 and pp. 216, 218, February 26, 2003, vol. 29).

47.     Mervolion testified about an arrestee by the name of Carlos Diaz. Mervolion testified that on that day he rode with Aguero but when they got to the location Mervolion remained in the car Aguero came out with a jacket. Later investigation showed that a gun was seized and not documented. (*Acuna, supra*, Order, Gold, J. on Rule 801 (D)(2)(e) Statements, pp. 58 and 59, Mervolion trial testimony, pp. 284, ll. 10-25, p. 285, ll. 1-25, February 13, 2003).

48.     Aguero told Mervolion not to say he rode with him (Aguero) as he could not get linked to another gun. (Mervolion trial testimony, p. 304, ll. 23-26, pp. 305, ll. 1-15, pp. 284, ll. 10-25, pp. 285, ll. 1-25, February 13, 2003).

49.     A gun was seized from suspect James Brown's apartment but was not documented or given back to Mr. Brown. (*Acuna, supra*, Order, Gold, J. on Rule 801 (D)(2)(e) Statements, pp. 77-78 and p. 81). Mervolion stated that he had little to do with the arrest and he did not seize property, however he did see Aguero carry a box downstairs. (Mervolion trial testimony, pp. 227-229, February 26, 2003, vol. 29).

50.     Mervolion testified that Ray Socorro who was the I.A investigator at the I-395 shooting, had given a gun to Pepe Quintero prior to his transfer to the I.A department; it was this gun that was used as the throw down. (Mervolion trial testimony, p. 262, ll. 5-25, and p. 263, ll. 1-2, February 13, 2003 and Grand Jury Testimony p. 99-04, p. 27-29, August 30, 2001).

51.     Mervolion testified that all the officers "hung out" together and were friends on and off duty. (Mervolion trial testimony, pp. 264, ll. 12-25, p. 265, ll. 1-14, February 13, 2003).

11

52.     Attached and marked as **Exhibit 25** is Plaintiff's previously marked deposition Exhibit 30, which is an internal affairs investigation done when Frank Christmas was a commander and an investigation in which Christmas was in charge. The Hoban case went through a homicide investigation (like in this case) and all officers were cleared of wrong-doing. Thereafter an internal investigation was conducted mostly at the urging of the federal government which investigation found that the shooting of Hoban was not justified and that evidence had been planted. (Christmas Dep., civil case, pp. 68-71, ll. 1-3). Eventually, after the Allen incident, officials at the highest level of the City of Miami realized that the homicide unit in charge of investigating police officer involved shootings was improperly investigating such cases – this caused a change in the Miami police department. (Christmas Dep., civil case, p. 74 ll. 21-25, p. 75, ll. 1-25 and p. 76, ll. 1-25). Christmas also testified that in at least four other police involved shootings that predated the year 2000 homicide teams that investigated those shooting, all officers were cleared of any wrong doing only to discover later that the police involved shootings were tainted by evidence planting and the filing of false police reports. (Christmas Dep., p. 78, ll. 1-17, p. 79, ll. 1-25 and p. 80, ll. 1-16).

53.     Christmas also testified that the Miami police department never went back on an internal affairs basis to conduct an investigation as to what the homicide unit did, how they investigated their cases or how they came to their conclusions. (Christmas Dep., civil case, p. 80 ll. 18-23). Christmas confirmed the information pertaining to suspect/decedent Richard Brown in his testimony that homicide did an investigation that later on proved to be faulty. (Christmas Dep., civil case, p. 80, ll. 24-25 and p. 81, ll. 1-11).

54.     Christmas testified that the homicide department investigated the shooting of Mr. Hoban and concluded that it was a justified use of deadly force. Thereafter it was determined that there was gun planting at the scene by police officers and that the use of force was unjustified. (Christmas Dep., civil case, p. 83, ll. 1-25).

55.     In this case even after Mr. Allen filed a complaint regarding the shooting, no action to investigate this case made by the Miami police department. (**Exhibit 26**).

## CAREERS OF OFFICERS IN THE MIAMI POLICE DEPARTMENT

56.     Between 1984 and 2000, Defendant Gonzalez was the subject of thirty-seven Internal Affairs investigations, seven of which were in response to abusive treatment, others

included misconduct, discourtesy, harassment and improper procedure.   Of the 38 cases investigated, 5 were sustained, 6 were determined to be inconclusive, 4 were withdrawn, 2 were found to be unsupported, 1 was classified as information only, Gonzalez was cleared of 10 and as of report dated July 22, 2004, there were 10 incidents for which no disposition was indicated. However, despite this extensive list, Gonzalez was promoted from sergeant to lieutenant, was head of Homicide unit and remained a police officer until his indictment in 2001.   See Exhibit 21 and 21a.

57.     Between 1996 and 2002, Defendant Tapanes was the subject of 29 Internal Affairs investigations, 1 was found to be sustained/filed, 1 was found as unsupported, 10 were found as inconclusive and 15 were shown as cleared and 2 had no action written. See Exhibit 22.

58.     Defendant Camacho was investigated by Internal Affairs 5 times between 2000 and 2002, and of these incidents, 1 was sustained, 2 were cleared and 2 were found to be inconclusive. See Exhibit 23.

59.     Carlos Avila, the investigator in this case, was investigated by Internal Affairs 9 times between 1984 and 2002, and of these incidents, 1 was found to be sustained, 3 were found to be cleared and 3 were filed with no disposition noted. (**Exhibit 24**).

60.     Officers of the City of Miami conspired to and did use a "throw down weapon" to legitimize heir shooting of Antonio Young. (Gold Order on Rule 801 (D)(2)(e) Statements, page 17 and 18).   The City of Miami used "throw down weapons" to legitimize other shootings. (Mervolion trial testimony, p. 265, ll. 19-25, p. 266-269, February 13, 2003).

61.     Attached as **Exhibit 27** are the Miami Police department's Master shooting list showing 232 intentional discharges of firearms between the years of 1990 – 2003 where there was either no inquest or the shooting was found justified including the shooting of David Allen, the I-395 shooting, Coconut Grove shooting and the 43rd Street (Steven Carter) shooting.

62.     Attached as **Exhibit 28** (previously marked as "Government Exhibit 5" in *Acuna, supra*) is a report listing officer involved shootings from February 1990 through April 2001 indicating possible problems that are suggestive that the shooting might not have been justified, but with a column indicating in most instances a finding of 'justified'.

63.     Defendant Gonzalez herein, and his co-conspirators from I-395 shooting all had extensive Internal Affairs files. As sergeant in charge of the Street Narcotics Unit on the night of

the Wiltshire and Young shootings[2] and thereafter having been promoted, Defendant Gonzalez knew or should have known that Hames was the subject of five Internal Affairs investigations -- three were in response to allegations of excessive force. (**Exhibit 29**). Between 1983 and 1995, Beguiristain was the subject of eight Internal Affairs investigations six of the eight were in response to allegations of excessive force and/or abusive treatment. (**Exhibit 30**). Jose Garcia was the subject of six Internal Affairs investigations four of which concerned allegations of abusive treatment. (**Exhibit 31**). Jesus Aguero was the subject of at least eleven Internal Affairs investigations five of which were in response to allegations of excessive force. (**Exhibit 32**).

64.    The U.S. Department of Justice, civil rights division, conducted an investigation of the Miami Police Department pursuant to the Violent Crime Control Law Enforcement Act of 1994 and reduced its findings to a memorandum directed to Miami City Attorney Alejandro Vilarello. The investigation revealed that the Miami police department was not consistent in their definition of the appropriate use of force and it failed to give guidance as to what constituted a reasonable use of force. (**Exhibit 33**, pp. 1-4). It further states that the use of force reporting was inadequate and likely to lead to under reporting on use of force, it also found that there was a weakness in policy in governing supervisory roles in the use of force. (*Id*. at 11-12). The investigation also found problems with accepting external complaints, in-take and tracking of complaints and lastly it found that the Miami Police Department is not sufficiently aware in what occurs in the training process. (*Id*. at 17-20).

## MEMORANDUM OF LAW

### INTRODUCTION

As an introduction to his Memorandum of Law the Plaintiff went into great detail in the fact section of this brief to demonstrate the abuses within the Miami police department of gun planting, gun confiscation, conspiracy, a 'code of silence' and other instances of the unjustified use of deadly force to show that these acts were pervasive and widespread and have been occurring for many years. This, Plaintiff argues, is the custom that was the moving force behind

---

[2] Reminding the Court that after the I-395 shooting and the conspiracy meeting Gonzalez was eventually promoted to Assistant to the Chief and then to the head of the Homicide division, which was his position at the time of Mr. Allen's investigation.

the constitutional violations that led to the deprivation of Plaintiff's constitutional rights. Plaintiff further argues that it is these facts that are material and that the law demands denial of this motion and submission of this case to a jury.

As this is the City of Miami's Motion for Summary Judgment it can only be granted if the pleadings, depositions, answers to Interrogatories and Admissions on file, together with Affidavits, if any show that there is no genuine issue as to any material fact then and only then can the motion be granted. _Celotex Corp. v. Catrett_, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed. 265 (1986). The Court is compelled under the law to construe all facts and draw all reasonable inferences in the light most favorable to the non moving party. _Arrington v. Cobb County_, 139 F. 3rd 865, 871 (11th Cir.1998).

Although this Court is undoubtedly familiar with the dictates of _Monell v. Department of Social Services,_ 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed. 2d 611 (1978) and 42 USC §1983, it can never hurt to embark on a brief review of the above statute and case. The Plaintiff understands that this is not a case of respondeat superior but rather _Monell, supra,_ held that only "customs" or "policy" could lead to municipal liability. The Plaintiff brings to this argument considerable proof not merely of this single isolated incident that the City of Miami had of failing to supervise its officers and/or a custom and practice of covering up police officer involved shootings and/or failing to adequately train its officers which in turn lead directly to and was the driving force behind the violation of this Plaintiff's constitutional rights but rather a twenty year history of this kind of conduct of which the City had knowledge at its highest levels.

It is elementary that when a police officer uses excessive force upon a citizen he violates that persons Fourth Amendment rights. Herein, if Plaintiff's truck was not moving and Tapanes was not in danger of being run over and Tapanes shoots Allen nonetheless the Plaintiff has presented evidence to this Court that there was an underlying violation of the Plaintiff's constitutional rights as a consequence of this July 27, 2000 occurrence.

This case is about more than inadequate training and supervision. These are elements to be sure, however, as the court in _Grandstaff v. City of Borger Texas_, 767 F.2d 161 (1985) noted:

> Where Police officers know at the time they act that their use of deadly force in conscious disregard to the rights and safety of innocent third parties will meet the approval of city policymakers, the affirmative link/moving force requirement is satisfied. [15] That was the rationale of this court in _Languirand v. Hayden_, 717 F.2nd 220 (5th Cir.1983), cert.

denied, --U.S.--, 14 S.Ct.2656, 81 L.Ed.2d 363 (1984). Conscious indifference to widespread incompetence or misbehavior may be more than a matter of extreme negligence and more than a failure to instruct or train. If it is the deliberate police policy to demand instant compliance, heedless of rights and risks, abuses i.e., incompetence and misbehavior-will occur when officers of varying judgment and stability encounter resistance. If unconfined the policy ordains use of the ultimate compulsion, the firearm, upon any appearance of resistance and with only imagined justification. That policy employs armed officers who subject the public to the deprivation of their constitutional rights. Where the city policymaker knows or should know that the city's police officers are likely to shoot to kill without justification and without restraint, so as to endanger third parties, the city should be liable when the enviable occurs and the officers do so. (p. 170).

The Plaintiff presents to this court deposition testimony, trial testimony and affidavits to show that a genuine issue of material facts exists which would preclude summary judgment on the Plaintiffs claim that on July 27, 2000, it was the custom in the City of Miami to improperly use deadly force due to inadequate training and supervision and thereafter cover up the unconstitutional act through various tactics including the filing of a knowingly false or of a materially misleading police reports, failing to supervise and discipline police officers and to tolerate acts of excessive force by its officers. All of these issues as well as deficient Departmental Orders more particularly outlined in the U.S .Department of Justice report dated March 13, 2003, and marked as Plaintiff's Exhibit 33, ultimately became the driving force behind the violation of Plaintiff Constitutional rights.

In order for Plaintiff to proceed against the City of Miami under *Monell*, *supra*, the Plaintiff must present evidence at this stage of the proceeding that there are material fact questions showing that the Plaintiff's constitutional rights were violated. This the Plaintiff has done. Officer Tapanes testified that the only reason that he used deadly force was because David Allen was trying to run him over at the time of shooting. The Plaintiff has presented to this Court testimony of four (4) witnesses that testified at various proceedings, that Tapanes was in no danger of being run over by Mr. Allen and that the first shot fired was into the cab of Mr. Allen's truck when it was not moving. The Plaintiff has also come forth with further evidence that after the shooting Defendant Nelson Andreu filed a materially false police report by stating that with "slight variations" all civilian witnesses agreed with the Tapanes version of what happened. The civilian witnesses including; Sharayne Milton, Ira Davis and Phyllis Taylor did

16

not give slight variations about what happened but markedly different variations thus making the submission of Andreu's police report a violation of Plaintiffs constitutional rights. The Plaintiff has also presented this Court with evidence that Defendant Calvar suborned the perjury of civilian witness Christopher Jones in exchange for Jones release on obstruction of justice charges. The Plaintiff has also set forth facts that on several occasions prior to July 27, 2000, there were police officer involved shootings that were covered up, that guns were illegally confiscated so as to facilitate instances of throw downs and there existed a code of silence so that officers including Gonzalez would not be held accountable for unconstitutional uses of deadly force.

The Plaintiff will now set forth his legal argument that a custom and practice in the Miami police department was the driving force behind the violation of his constitutional rights. To begin this analysis Plaintiff has attached a copy of two (2) court orders (**Exhibits 34** and **35**) wherein a Judge Jose E. Martinez of the U.S. District Court for the Southern District of Florida denied the City of Miami's Motion for Summary Judgment and in so doing held that there were fact questions as to whether the City of Miami had an official custom or policy that mounted to a deliberate indifference of misconduct of its officers. The orders emanate out of a case known as *Young v. City of Miami, et al*, Case No. 99-2944-CIV, US District Court for the Southern District of Florida. Therein, then Sergeant Israel Gonzalez along with other officers under his charge shot and killed two (2) citizens. Although the shooting was justified by the Homicide division of the Miami Police department it was later learned through sworn criminal trial testimony that in order to justify the shooting, guns were thrown down and thereafter Gonzalez and others conspired to conform to a blue code of silence.

To begin, the City of Miami has been aware for over twenty (20) years of its pervasive failures within its Police Department and has done absolutely nothing to rectify these failures. (See Exhibit 13 herein). As recently as 2003, the U.S. Department of Justice, pursuant to Federal statutory authority studied the Miami Police Department and its findings are contained in Exhibit 33. The City of Miami's failure to rectify these problems within the police department and its acquiescence to the constitutionally objectionable behavior by its police officers and its police department and its tacit authorization of the offensive conduct of its police officers amounts to deliberate indifference which will impose liability under 42 USC §1983 upon a municipality.

In *City of Los Angeles v. University of California*, 885 F.2d 1439 (9th Cir. 1989) the court observed:

> With respect to custom, the Court in Monell asserted that 'although the touchstone of the 1983 action against a government body is an allegation that official policy is reasonable for a deprivation of rights protected by the Constitution, local governments...by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision-making channels." *Monell*, *supra* 436 U.S. at 690-91, 98 S.Ct. at 2035-36.  Consistent with the commonly understood meaning of custom, proof of random acts or isolated events are insufficient to establish custom. *Palmer v. City of San Antonio*, 810 F.2nd 514, 516 (5th Cir.1987); *Depew v. City of St. Mary's*, 787 F.2nd 1496, 1499 (11th Cir.1986).  Only if a plaintiff shows his injury resulted from a "permanent and well-settled" practice may liability attach for injury resulting from local government custom.  See *Praprotnik*, *supra*, 108 S.Ct at 926 (quoting *Adickes v. S.H.Kress & Co.*, 398 U.S. 144, 168, 90 S.Ct. 1598, 1614, 26 L.Ed.2d 142 (1970) ('a plaintiff may be able to prove existence of a widespread practice that, although not authorized by written law or express municipal policy, so permanent and well-settled as to constitute a custom or usage with the force of law').  If such a showing is made, however, a local government may be liable for its custom irrespective of whether official policy makers had actual knowledge or the practice at issue.  The existence of the custom as a basis for liability under 1983 thus serves a critical role in insuring that local government entities are held responsible foe widespread abuses or practices that cannot be affirmatively attributed to the decisions or ratification of an official government, policymaker but are so pervasive as to have the force of law. *Id*.

The United States Supreme Court held in *City of Canton v. Harris*, 489 U.S. 378 (1989), that the deliberate indifference standard governing inadequate training claims logically extends to related claims of deficient supervision, discipline and remedial action. To establish a "deliberate or conscious choice" or such "deliberate indifference" the Plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and made a deliberate choice not to take any action, *Board of County Commissioners v. Brown*, 520 U.S. 397 (1997).  To prove such deliberate indifference the Plaintiff must:

> "...show that the need for more or better supervision to protect against constitutional violations was obvious.  An obvious need may be demonstrated through proof of repeated complaints of civil rights violation; deliberate indifference may be inferred if the complaints are

filed by no meaningful attempt on the part of the municipality to investigate or forestall further incidents." *Vann v. City of New York*, 72 F.3rd 1040, 1049 (N.Y.C.A. 2 1995).

Herein, the signs were obvious that a particular department of the Miami Police Department (*i.e.*, Street Narcotics, Crime Suppression and S.W.A.T) were the subject of deficient supervision and training as evidenced by the improper use of deadly force in the cases pursued by the Federal Government referenced herein.

The Plaintiff has attached as Exhibit 33, Final report of the Grand Jury, Police Use of Deadly Force. In 1982 as a result of "a number of police shootings which have occurred in a short time", a Grand Jury was convened to point out problems and offer solutions. (Exhibit 13, p. 1). The Grand Jury findings were startling. The Grand Jury determined that the City of Miami in their training programs had "placed entirely too much emphasis upon weapons, use of force in police training and far too little emphasis on alternatives to the use of force." (*Id*. at 4).

In *Turpin v Mailet*, 619 F.2d. 201 (2nd Cir. 1980). The court held:

> "For example where senior personnel have knowledge of a pattern of constitutionally offensive acts by their subordinates but fail to take remedial steps, the municipality may be held liable for subsequent violations if the superiors' inaction amounts to deliberate indifference or to tacit authorization of the offensive acts."

In this case one only needs to look at the personnel record of Israel Gonzalez who was head of the Homicide division that investigated the July 27, 2000 incident involving Mr. Allen to see that the Defendant City of Miami failed to adequately discipline, supervise or train its officers.

At his deposition, Defendant Israel Gonzalez, took the Fifth Amendment on most substantive issues however the following can be said based on sworn testimony. In Plaintiff's statement of facts the court is referred to the trial testimony of William Hames and John Mervolion who testified that Israel Gonzalez was a sergeant in charge of the street narcotics unit on the night Wiltshire and Young were killed. Gonzalez seemed to head up a meeting with all the officers involved in the shooting where a conspiracy was formulated. Israel Gonzalez despite a shocking number of complaints and disciplines later became promoted to the Assistant to the Chief of Police overseeing the disciplinary review board and eventually became a lieutenant in charge of the Homicide division. As Gonzalez was being promoted he took with him the

knowledge of the careers of many undercover officers including the aforementioned Hames and Mervolion, Art Beguiristain, Jose Garcia and Jesus Aguero, his co-conspirators in the I-395 shooting. Gonzalez himself was the subject of 38 internal investigations. (See Exhibit 21 and 21a herein). As Sergeant in charge of the street narcotics unit on the night of the Wiltshire and Young shootings and thereafter having been promoted Gonzalez knew or should have known that: Mervolion was the subject of six Internal Affairs investigations with one in response to alleged abusive treatment and/or excessive force; Hames was the subject of five Internal Affairs investigations -- three were in response to allegations of excessive force; that between 1983 and 1995, Beguiristain was the subject of seven Internal Affairs investigations four of the seven were in response to allegations of excessive force; that Jose Garcia was the subject of nine Internal Affairs investigations four of which concerned allegations of excessive force and Jesus Aguero was the subject of nineteen Internal Affairs investigations nine of which were in response to allegations of excessive force. (See **Exhibit 32**).

It is important to note that the validity of the claims is irrelevant. The vast number of complaints against the officers is enough to put the City of Miami on notice that there was a possibility that its officers were illegally using force. See, *Ricciuti v. N.Y.C. Transit Authority*, 941 F.2d 119 (N.Y.C.A. 2 1991). The Plaintiff presents evidence to this Court showing a widespread, persistent pattern of misconduct existed within the City of Miami police department. In *Barreto-Rivera v. Medina Vargas*, 168 F.3d 42 (1st Cir. 1999), the First Circuit Court of Appeals held that allowing a police officer to remain on the job who had been disciplined multiple times[3]; who stayed on the job despite recommendations to fire him[4]; and his behavior did not change in spite of sanctions, amounted to deliberate indifference.

The idea of covering up police officer involved shootings was so widespread that it had its own code language. The testimony of Hames and Mervolion confirms that if a thrown down is needed to call 'Pepe' (aka Jose Quintero) who would then be asked to bring 'the sock'. See Plaintiff's Fact section, para. 36-37, herein.

From a fact standpoint the Plaintiff has brought to the Court's attention the so-called "Coconut Grove" shooting which involved the shooting of an unarmed man by Miami police and then the planting of a gun by Miami police officers to justify the shooting. This case was

---

[3] Gonzalez was often disciplined yet promoted to the highest levels within the City of Miami police department.
[4] Tapanes was recommended to be terminated by the Firearms Advisory Board but stayed on the job nonetheless.

investigated by the homicide department and found to be a justified police officer involved shooting. The Plaintiff has also factually brought to the Court's attention the so-called "43rd Street" shooting where again Miami police officers planted a gun at the scene of a shooting. Defendant herein Gonzalez and others were found guilty of obstruction of justice, conspiracy to obstruct justice and perjury at the so called "I-395" shooting where throw down guns were planted on scene. The Plaintiff has factually brought to this Court other shocking facts of outrageous conduct by Miami police officers. It is Plaintiff's position that these incidents as well as the shooting of David Allen and the subsequent cover up show a common design and support an inference that there was municipal tolerance of this practice. In *Carter v. District of Columbia*, 795 F.2nd 116 (D.C. Cir. 1986) the Court therein held: "Egregious instances of misconduct, relatively few in number but following a common design, may support an inference that the instances would not occur but for municipal tolerance of the practice in question." (p. 124). Likewise in *Bennett v City of Sidell*, 728 F.2nd 762 (1984), the Court held:

> "Sufficient duration or frequency of abusive practices or other evidence must warrant a finding of knowledge on the part of the governing body that the objectionable conduct has become customary practice of city employees. Where the violations are flagrant or severe, the fact finder will likely require a shorter pattern of conduct to be satisfied that diligent governing body members would necessarily have learned of the objectionable practice and acceded to its continuation. Knowledge of a continuing practice of City employees may be attributed to the governing body in one of two ways. Actual knowledge may be shown by such means as discussions at counsel meetings or receipt of written information. Constructive knowledge may be attributed to the governing body on the ground that it would have known of violations if it had properly exercised its responsibility, as, for example, where violations were so persistent and widespread that they were subject of prolonged public discussion or a high degree of publicity." *Id*. at 768.

Herein, the City of Miami had actual knowledge of the abuses of force (Grand Jury Report, 1982), in 2001 and 2003 (the federal indictment and subsequent conviction) and again in 2003 (the Justice Department study). The Plaintiff argues that Israel Gonzalez had actual knowledge as head of the unit that investigated the David Allen shooting that investigations can be conducted in such a way as to improperly justify the police officer involved shootings.

It is the position of Plaintiff that Gonzalez as head of the homicide division charged with the responsibility of investigating all police officer involved shootings back in the year 2000 had

actual knowledge of the so called code of silence evidenced by his conspiratorial conduct which ultimately lead to his conviction for obstruction of justice, conspiracy to obstruct justice and perjury.

In *Bordinaro v. McCloud*, 871 F.2d 1151 (1st Cir. 1989), the court held that:

> "Where other evidence of a policy has been presented and the single incident in question involved the considered action of a large contingent of Municipal employees, the event itself provides some proffer of the existence of the underlying policy or custom." *Id*. at 1157.

*Bordinaro*, *supra*, also stands for the proposition that:

> "constructive knowledge 'may be evidenced by the fact that practices have been so widespread or flagrant and in the proper exercise of official responsibilities the municipal policy maker should have known of them." *Id*. at 1157.

The Plaintiff will also present expert testimony regarding the police misconduct at issue. Expert testimony is an appropriate means of presenting evidence of the liability of the city and/or its policy makers. *Larez v. City of Los Angeles*, 946 F.2d 630 (1991). The Court is referred to the affidavit of police liability expert Dr. George Kirkham which is attached hereto as **Exhibit 36** and incorporated herein by reference. The Court is also referred to the March 13, 2003, letter from the U.S. Department of Justice to the Miami City Attorney wherein an investigation undertaken pursuant to federal statute revealed that many aspects of Miami's interdepartmental orders are deficient. Since this report is a public record done pursuant to statute it is completely admissible for the Court to review in this motion and at the time of trial. (See, Federal Rules of Evidence Rule 803.8). These deficiencies are set forth in Dr Kirkham's affidavits as he will testify to these deficiencies at the time of trial.

The Court is next referred to the case of *Kerr v. City of West Palm Beach,* 875 F.2d 1546 (1989). Therein the Eleventh Circuit Court of Appeals held:

> "On the other hand if there is substantial evidence opposed to the motions, that is, evidence of such equality and weight that reasonable and fair minded men in the exercise of impartial judgment might reach different conclusions, motions should be denied." *Id*. at 1555.

After making that general statement regarding the standard for dismissal of a case for failure to train and/or supervise the court went on discuss *City of Canton v Harris*, 489 U.S. 378,

109 S.Ct 1197 103, L.Ed 2d 412 (1989). In reversing the lower court the *Kerr, supra*, court looked at evidence amazingly similar to the instant matter. Although the subject in *Kerr, supra*, was training for a canine unit it was an issue of training nonetheless. Herein we have a statutorily authorized investigation by the US Government which is addressed in the attached affidavit of Dr George Kirkham specifically referencing all the failings in the City of Miami's formal policy and procedure regarding use of force, supervising and training officers.

The *Kerr* court went on to acknowledge:

> "For example city policy makers know to a moral certainty that their police officers will be required arrest fleeing felons. The city has armed its police officers with firearms; in part to allow them to accomplish this task. Thus the need to train officers in the constitutional limitations on the use of deadly force (see *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)), can be said to be "so obvious" that the failure to do so could properly be characterized as "deliberate indifference" to constitutional rights. It could also be that the police, in exercising their discretion so often violate constitutional rights that the need for further training must have been plainly obvious to the city policy makers nevertheless are "deliberately indifferent" to the need. *Id* at n. 10, 109 S.Ct. at 1205 n. 10. After considering all the circumstantial evidence we believe that a reasonable jury, could have so concluded, finding the unconstitutional character of many canine unit apprehensions was plainly obvious to the city officials, who then deliberately chose not to take corrective action". *Id.* at 1556.

Herein, Plaintiff argues that the abuses regarding police officer involved shootings, the illegal, unreported confiscations of firearms to be later used as 'throw downs', the factual testimony regarding the code of silence within the Miami police department, the incidence of proven cover-ups, the horrific professional records of many of the officers involved in police officer involved shootings including Gonzalez, Tapanes and other officers under Gonzalez charge as well as the planting of a weapon herein, shows a pattern of behavior and a custom so deeply ingrained in the Miami police department that it indeed had the force of law.

In *Depew v. The City of St. Mary's, Georgia*, 787 F.2d 1496 (11th Cir.1986), the court acknowledged that the City provided rules and regulations but despite knowledge of improper police conduct the city took no remedial action therefore the policy or custom became actionable under section 1983. Herein we have exactly the same situation. In 1982, the City of Miami in a Grand Jury report was advised of abuses. According to the sworn testimony of Expert witness

Alphert the City went on a bad hiring spree which fostered many bad officers and bad practices. Then the City was made aware of the high profile government prosecution of 11 of its officers but did noting to take remedial action as evidenced by 2003 investigation by the US Justice Department referenced herein as Exhibit 33.

The _Depew_, _supra_, court held:

> "The continued failure of the city to prevent known constitutional violations by its police force is precisely the type of informal policy or custom that is actionable under section 1983". _Id_. at 1499.

Plaintiff will now specifically address arguments and misstatements made in the City's Statement of Facts and Memorandum of Law. First of all the Plaintiff would like to point out that the court allowed discovery to proceed against City of Miami and all defendants except Camacho, since Camacho's case was on appeal. The City of Miami now attaches the affidavit of Pablo Camacho in support of Defendants motion; Plaintiff argues that this is patently unfair.

The Plaintiff admits that the City of Miami has departmental orders. Plaintiff does not deny that police officers go through police academy training and in-service training. Where there are substantial and material fact questions for jury resolution involve whether the departmental orders are constitutionally sufficient, not outdated and allow for proper training and supervision. This is where there will be factual disputes and material issues for jury resolution.

Defendant argues that the state attorney's office controls police officer involved shootings. This is contrary to the sworn testimony of Gonzalez and Andreu. The homicide division investigates police officer involved shootings. Defendant argued that the Defendants had probable cause to arrest the Plaintiff for exposure of his genitals however the Nelson Andreu report (Exhibit 4) reflects that no one ever saw Plaintiff's genitals.

Finally the Defendant asserts that the Plaintiff has not pled constitutional violations against the City of Miami. The court is respectfully reminded that the Plaintiff is before this Court pursuant to _Monell_, _supra_, which provides for a federal cause of action under a 42 USC §1983 based on a municipality's custom or practice. Plaintiff has clearly pled in paragraphs 59 and 60 that there was a custom and practice within the City of Miami which was the driving force behind the violation of Plaintiff's civil rights.

Next, the City of Miami argues that the fact that there was a cover-up including filing false police reports the subornation of perjury cannot serve as the basis for the violation of Plaintiff's Constitutional rights. It is the cover up in the David Allen case taken together with the previous cover-ups that resulted in federal convictions that show it is the custom and practice that was the driving force behind the violation of Plaintiff's constitutional rights.

The Plaintiff will now address its negligence claims against the City of Miami. The City is trying to argue is that it can never by liable for the negligence of its employees, which of course, is simply not the case. The Court is directed to the case of *Maybin v. Thompson*, 514 So.2d 1129. Therein, the Plaintiff sued on claims of assault, battery, false arrest and imprisonment. In pertinent part the court held:

> "The legislature has relieved municipalities of liability for the tortuous actions of employees only when the employees acts or omissions are committed "outside the course and scope of his employment or committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard for human rights, safety of property"... nor do we believe that a government is never liable for the intentional torts of employees. In Hennigan v. Department of Highway Safety and Motor Vehicles, 467 So.2d 748 (Fla. 1st D.C.A. 1985) the court held that sovereign immunity does not par claims for tortuous acts that arise from an officer's conduct during and after an arrest. In Richardson v. City of Pompano Beach, 511 So.2d 1121 (Fla. 4th D.C.A. 1987), the court held that a city may be liable for the intentional torts of a police officer committed during arrest and detention."

The Court is also directed to *Farabee v. Rider*, 995 F.Supp. 1398, wherein the court held that:

> "The Florida Supreme Court has determined that law enforcement has a duty of care to protect detainees from personal harm. See Johnson v. Cannon, 947 F.Supp. 1567 citing *Kaisner v. Kold*, 543 So.2d 732, 734 (Fla. 1989). (When an individual is detained or placed in custody he is owed a common law duty of care.)"

In conclusion the court is advised that in an attempt to take his freedom away the State brought charges against the Plaintiff for assault with a deadly weapon based on the City's investigation. A jury of his peers acquitted Mr. Allen and obviously did not accept the testimony of Officer Tapanes. See Exhibit 9. Not only did the City of Miami try to take away Mr. Allen's

freedom, the gunshot wound caused a permanent and debilitating injury to Mr. Allen which has disabled him from his occupation as a construction ironworker.

The Plaintiff will prove that for over twenty (20) years the City has tolerated the abuses of its officers. Herein, the City of Miami was advised by the Firearms Advisory Board (See Exhibit 14 that Tapanes should be terminated, but the recommendation was not followed. Instead, the City continues to employ Tapanes as a police officer but is not providing him a defense or indemnification for this claim.

The Plaintiff presents this Court with a plethora of material fact questions that preclude summary judgment regarding the §1983 claim, including, but not limited to whether the City has an official custom or policy that amounted to deliberate indifference of the misconduct of its officers.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished by U.S. Mail to Jorge L. Fernandez, City Attorney and Henry J. Hunnefeld, Assistant City Attorney, 945 Miami Riverside Center 444 S.W. 2nd Avenue, Miami, FL 33130 and Ronald J. Cohen, Esquire, Andrew Jackson Building 8100 Oak Lane, Suite 403 Miami Lakes, FL 33016 on March 11, 2005.

> Hoffman & Morris, LLC
> 2655 North Ocean Dr., Suite 300
> Singer Island, FL 33404
> Telephone: (561) 840-3406; Fax: (561) 840-3407
>
> John J. Hoffman, Esq.
> Florida Bar No.: 604755

26

# UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF FLORIDA

## CASE NO. ___*03-21063cv CMA*___

## ATTACHMENT  TO / OR DOCKET ENTRY #

_____

# NOT SCANNED

☒ VOLUMINOUS (exceeds 999 pages = 4 inches)
☐ BOUND EXTRADITION PAPERS
☐ ADMINISTRATIVE RECORD (Social Security)
☐ STATE COURT RECORD (Habeas Cases)
☐ SOUTHERN DISTRICT TRANSCRIPTS
☐ LEGAL SIZE
☐ DOUBLE SIDED
☐ PHOTOGRAPHS
☐ POOR QUALITY (i.e. hand written, legal size, light print, etc.)
☐ SURETY BOND (original or letter of undertaking)
☐ OTHER_____

# PLEASE REFER TO COURT FILE